599 So.2d 181 (1992)
CARROLL STEEL ERECTORS and the Claims Center, Appellants,
v.
Walter ALDERMAN and Jeanette Alderman, Appellees.
No. 91-1798.
District Court of Appeal of Florida, First District.
April 30, 1992.
Rehearing Denied May 28, 1992.
*182 Dennis A. Ross, Lakeland, for appellants.
C. Kenneth Stuart, Jr., Lakeland, for appellees.
SMITH, Judge.
Appellants seek reversal of a workers' compensation order awarding death benefits to appellees as parents of an employee killed in an industrial accident. We affirm, except as to that portion of the order assessing penalties.
On appeal, appellants contend that appellees failed to carry their burden of proving dependency upon their son at the time of his death, and continuing thereafter; and in addition, appellants point to findings made by the judge in support of his final order which are unsupported by competent substantial evidence. Appellants also point to language which they argue indicates the application by the judge below of an erroneous standard of proof with respect to the issue of dependency, and his failure to consider the impact of the life insurance proceeds received by Mrs. Alderman. Although we find merit in appellants' arguments on these issues, we nevertheless conclude that upon consideration of the evidence in the light most favorable to appellees, and applying the presumption of correctness to the findings of the JCC where supported by competent, substantial evidence, we are compelled to affirm.
Wayne Alderman, son of the appellees, Walter and Jeanette Alderman, was killed in an industrial accident on November 3, 1989 while in the scope of his employment with appellant Carroll Steel Erectors. At the time of his death, he was living with his parents in their home in Mulberry, Florida. He had resided with his parents for approximately 11 years and had no known plans to live elsewhere. Wayne had his own room in the home, and in addition, had the benefit of having all meals prepared by Mrs. Alderman, who also attended to his laundry, cleaning, and other household services. In return, Wayne paid for the groceries consumed by the family, consisting of himself, and his parents, and he also paid other household expenses, including a monthly mortgage payment on the home of $203.66. In addition, Wayne provided services in maintaining the home and yard, and performed repairs on appellees' automobile.
Mrs. Alderman testified that she was given a pacemaker in 1985 or '86, and has not been employed outside the home since that time. Mr. Alderman, who was born on May 25, 1929, had heart bypass surgery in 1980 and again in 1984. He testified that after recovering from these operations, he returned to his fulltime occupation as a *183 crane operator for the years 1985 through 1989, the year of his son's death.
Mrs. Alderman testified that when Mr. Alderman started having heart trouble late in 1979 or early 1980, their son took over all the bills and paid for the food consumed at home. He regularly paid the electric, telephone, water, television cable and garbage bills. He also paid the automobile insurance bill for his parents occasionally. Sometime in 1986 or 1987 Wayne began paying his mother a flat amount of $300 a month to cover the household expenses. In addition, he provided $50 to $100 in cash each week for groceries. Mrs. Alderman testified that in addition to the $300 per month to cover bills, which included the mortgage payment, Wayne would pay her extra in event some additional amount was needed. A number of cancelled checks were introduced as a composite exhibit reflecting these payments in regular amounts over the period of some three years prior to Wayne's death.
Following their son's death, the Aldermans moved from their Florida home to Georgia, where they now reside in a home which they share with two of their other children. At the time of the final hearing, they were renting their Florida home for $510 a month. Mrs. Alderman testified that their present living conditions are not up to the standards they enjoyed while living in their Florida home. She explained that they moved to Georgia following their son's death because residing in the Florida home was too emotionally difficult, and because they could not afford to continue living there. In Georgia, they share expenses with their two children, and one other person residing in the home, dividing all of the bills into fourths, the Aldermans paying one-fourth of the household expenses.
At the time of his death, Wayne Alderman had an average weekly wage of $443.27. Mr. Alderman's income, from his steady employment as a crane operator, equaled or exceeded that of his son. Appellees reported disposable income (adjusted gross income minus taxes) for 1986 of $25,814; for 1987, $25,235; for 1988, $27,069; and for 1989, $21,137.[1] The income for those years includes Mr. Alderman's union pension of $182.50 per month.
Mrs. Alderman, as beneficiary of two life insurance policies on her son's life, received a total of $70,000 insurance proceeds. A portion of this money was used to pay off the indebtedness on Wayne's automobile, a 1984 Corvette, which she continues to own. Undisclosed amounts were also paid on Wayne's credit card bills, insurance, and money owed to the Internal Revenue Service. In addition to the 1984 Corvette, Mrs. Alderman also was the beneficiary of her son's Honda motorcycle.
The bulk of the insurance money was used to purchase a truck for Mr. Alderman to start his own interstate, long-haul trucking business. The truck was acquired in or around April 1990, at about the time the parties moved to Georgia. Their 1990 tax return reports the cost of the truck as $50,000, with an additional $3,432 spent on refurbishing before it was put into service, making a total cost of $53,432. Mr. Alderman quit his crane operator's job, apparently sometime in 1990, and reported only $6,843 in wages or salaries for 1990, and a business loss of $13,082 from the operation of his trucking business. He testified that he quit his job because he wanted to get into something that was less physically demanding, as driving the truck would be. He added it was difficult getting work as a crane operator at his age. The Aldermans reported for the year 1990 a negative adjusted gross income of $3,972 after deductions for depreciation on the truck and the rented home in Florida. Mr. Alderman testified that the low income from his trucking business was due to the lack of freight hauling assignments.
The burden was upon appellees to show that because of physical or mental *184 incapacity, or lack of means, they were dependent on the deceased for support. Panama City Stevedoring Co. v. Padgett, 149 Fla. 687, 6 So.2d 822 (1942); MacDon Lumber Co. v. Stevenson, 117 So.2d 487 (Fla. 1960); Terrinoni v. Westward Ho!, 418 So.2d 1143 (Fla. 1st DCA 1982); and Melweb Signs, Inc. v. Wright, 394 So.2d 475 (Fla. 1st DCA 1981). The judge below found that appellees met their burden, and we find no basis upon which to overturn that ruling.
In his final order, the judge found both appellees "physically limited based upon the testimony concerning their physical capabilities." No issue is made on appeal concerning Mrs. Alderman's physical capabilities. As for Mr. Alderman, aside from his history of heart surgeries, there is no evidence of any physical incapacity presently suffered by Mr. Alderman which would render him unable to work. However, his testimony that he found it necessary to seek a less physically demanding occupation is unchallenged. Mr. Alderman described his work as a crane operator as very physically taxing. He elaborated upon this further by explaining, among other things, that in contrast to vehicles designed for highway travel, crane equipment has no suspension system to protect the operator from bumps and jolts while riding over rough terrain, or even while travelling upon ordinary roadways. He also testified that he was having problems with the pulling and tugging required to run the cranes. Thus, while we could by no means envision long haul interstate truck driving as a sedentary occupation, it is clear that Mr. Alderman felt that truck driving was less physically demanding. Mr. Alderman's drastic reduction in income, which was noted by the JCC in his final order, appears without contradiction to be directly attributable to Mr. Alderman's physical limitations existing at the time of his son's death. The evidence concerning the physical limitations of both Mr. and Mrs. Alderman was undoubtedly a factor in the JCC's finding of "dependency" within the meaning of the statute as interpreted by the decisions above cited.
In his final order, the JCC accurately summarized the contributions made by Wayne towards his parents' living expenses and comfort. In addition, he found these contributions to be actual and substantial contributions which were made regularly, and, based upon the testimony of Mr. and Mrs. Alderman, were expected to continue in the future. Here again, the evidence supports the JCC's finding of dependency. As noted above, Mr. Alderman's net disposable income for the year 1989  the year of Wayne's death, and the last year Mr. Alderman worked as a crane operator  was $21,137. This translates to a monthly income of $1,761. After deducting the basic expenses which had been paid by their son Wayne,[2] Mr. and Mrs. Alderman had only $1,171 remaining monthly income to pay for other needs, such as insurance, clothing, medical and transportation expenses. The evidence fairly demonstrates appellees' inability to maintain their standard of living without their son's monthly contributions and services. See Melweb Signs, Inc., 394 So.2d at 476, 477 (finding of dependency affirmed where deceased son was paying more than one-half of household expenses of family of three). Cf. Cone Brothers Contracting v. Rogers, 432 So.2d 812 (Fla. 1st DCA 1983) (evidence did not support conclusion that contributions exceeded benefits to deceased son where the mother paid all taxes, utilities, and mortgage payments, and bought some food, and son paid $40 in cash per week, purchased some $50 worth of groceries per week, and performed some services as to which there was no evidence of value).
It is correct, as argued by appellants, that no direct evidence was presented to *185 demonstrate, and no finding was made by the judge, that the deceased son's contributions exceeded, in substantial amount, the reasonable value of the board, lodging, and other accommodations and services received by the deceased from his parents. Such proof has been held to be among the requirements for a showing of dependency in similar cases. See MacDon Lumber Co. v. Stevenson, supra, and Cone Brothers Contracting v. Rogers, supra. In the case before us there is evidence from which it can reasonably be determined that this requirement was satisfied. First, appellees rented their home for $510 per month not long after their son's death. During his lifetime, Wayne paid the mortgage payment of $203.66 per month on the home, which is greater than his pro rata share of the rental value of the home as indicated by the amount of rent appellees were able to receive for the home. In addition, Wayne paid all of the food and utility expenses for himself and his parents, and occasionally helped with automobile insurance premiums as well. We tend to agree with appellees' contention that since Wayne paid all of the household and food expenses, and more than one-third of the home's rental value, the judge could logically have concluded that his contributions, even without consideration of services performed by him as to which no value was stated, exceeded in substantial amount the value of the benefits he received.
That the contributions by Wayne to his parents were generous and beneficial to them is not disputed. Instead, appellants argue that although Wayne's contributions enhanced his parents' life-style, and the cessation of his contributions had a "negative impact," as found by the JCC, this does not establish "dependency" within the meaning of the statute. We agree. It is the extent of the "negative impact" that is critical in the determination of dependency. As stated in MacDon Lumber Co., supra, what is a substantial contribution sufficient to create actual dependency "must in each instance be determined by the extent to which the contributions of the deceased employee enabled the dependent to maintain his or her accustomed standard of living." 117 So.2d at 492. See also, Palm Beach Dairy Co. v. Ryan, 154 Fla. 648, 18 So.2d 537 (1944) (dependency under workers' compensation law "... is not limited to such as have a bare subsistence living or perchance a limited income from other sources... ."). We are persuaded that the JCC properly weighed the extent of the economic impact upon the claimants in arriving at the conclusion that dependency was established.
Turning to another issue, we note, as pointed out by appellants, that the final order contains no mention of the $70,000 in insurance proceeds received by Mrs. Alderman. We agree that the omission of any finding or discussion regarding the receipt of substantial life insurance or other benefits in a given case may warrant reversal for further consideration and findings on the issue of continuing dependency. As indicated in our decision in Terrinoni v. Westward Ho!, supra, even if dependency at the time of the employee's death is established, the beneficiary's receipt of a large sum of life insurance or other monetary benefits upon the employee's death may result in the termination of that dependency. As noted in that decision, section 440.16, Florida Statutes, expressly states that compensation for an employee's death based upon dependency shall be paid "during the continuance of dependency." Id.
Notwithstanding the absence of specific findings regarding the insurance proceeds, we are confident that the JCC did not overlook the evidence on this issue. The matter of the receipt of insurance proceeds was discussed by both counsel in final arguments before the JCC. In addition, in his final order, the JCC specifically found that Mr. Alderman was self-employed at the time of the hearing, and that his income has diminished drastically since the date of his son's accident. These facts were directly related to Mrs. Alderman's receipt of the life insurance benefits, since it was the appellees' decision to use the insurance proceeds that led to Mr. Alderman's self-employment in the trucking business. Moreover, we do not believe that it has been *186 demonstrated that the receipt of the insurance proceeds had the effect of terminating the dependency of either Mr. or Mrs. Alderman. As indicated earlier, appellees had at least $53,432 of the insurance money remaining after payment of their son's debts, for that is the amount spent in buying the truck and getting it ready for service. Whether they had any other remaining insurance proceeds is not disclosed by the record. Even assuming excess money remained, there is no record basis for the conclusion that the amount was so great as to terminate Mr. or Mrs. Alderman's dependency on their deceased son. By contrast, in Terrinoni, in which the court affirmed a finding that dependency had been terminated, the deceased son's mother, who was employed and receiving social security benefits, received $155,000 from a combination of sources as her son's sole heir and beneficiary. By comparison, $155,000 received in 1980 represents a substantially greater sum than $70,000 in the year 1990. We conclude, therefore, that the JCC did not err in refusing to find a termination of dependency, given the amount of insurance received by Mrs. Alderman, the physical condition of the parties and the means otherwise available to them.
We have not overlooked the JCC's finding that Mr. Alderman's disposable income "has been used to handle [the Aldermans] combined medical expenses." We agree that the record does not contain evidence to substantiate this finding. The record simply does not reveal the amount of medical expenses incurred by Mr. and Mrs. Alderman, nor the sources from which these expenses were paid. It does appear, from the testimony of Mrs. Alderman, that without their son's help, they would have "gone under." Other testimony indicates that she was referring to the periods in 1980 and 1984 when Mr. Alderman was recovering from his heart surgeries. On the other hand, there is no evidence that the appellees have accumulated any surplus funds or property subsequent to their medical problems, nor that their income was expended for something other than their needs. There is testimony that both Mr. and Mrs. Alderman incurred substantial medical expenses, and neither Mr. nor Mrs. Alderman was asked to give specific amounts.
We find it necessary to reverse on one issue. The final order states in part: "Penalties are due on the unpaid compensation since no formal notice to controvert was ever filed." Contrary to the JCC's order, a formal notice to controvert was filed within the 21-day period prescribed by section 440.20(6), Florida Statutes. Since there is a conflict between the JCC's order and the record, we reverse and remand for further consideration of this ruling as we did in Perkins Restaurant v. Cruz, 541 So.2d 1279 (Fla. 1st DCA 1989).
The order awarding death benefits is AFFIRMED; the order assessing penalties is REVERSED and REMANDED for further consideration.
ALLEN and KAHN, JJ., concur.
NOTES
[1] Mr. Alderman testified he had been employed as a crane operator since 1968. His most recent employment was with a crane leasing company in Lakeland. His work consisted of operating the leased crane, for which he was paid $11.00 per hour, or, when there was no crane work, he worked around the shop, for which he received $9.50 per hour.
[2] Basic monthly expenses included the home mortgage, $204; food (computed at two-third's of $100 x 4.3, or $286 per month); plus utilities (electricity and water) at $100 per month. These expenses, formerly paid by appellees' son, totalled $590 per month. The evidence indicates that Wayne was paying in excess of $700 per month toward these basic expenses. Had the Aldermans remained in their home, roughly the same basic expenses would have been required to maintain their customary standard of living, except for Wayne's pro rata share of food costs.